STATE of Missouri ex rel., JACKSON COUNTY PROSECUTING ATTORNEY, Relator,

v.

The Honorable Roger PROKES, Respondent.

No. WD 72996.

Missouri Court of Appeals, Western District.

Dec. 20, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 31, 2012.

Application for Transfer Denied May 1, 2012.

Tim E. Dollar and Michael J. Hunt, Kansas City, MO, for Relator.

Richard W. Johnson and Patrick W. Peters, Kansas City, MO, for Respondent.

Before: LISA WHITE HARDWICK, Chief Judge, Presiding, and JAMES M. SMART, JR., JOSEPH M. ELLIS, VICTOR C. HOWARD, JAMES E. WELSH, ALOK AHUJA, MARK D. PFEIFFER, KAREN KING MITCHELL, CYNTHIA L. MARTIN, and GARY D. WITT, Judges.

GARY D. WITT, Judge.

Relator State of Missouri, Jackson County Prosecuting Attorney ("State"), filed a writ of prohibition asking us to prohibit the Honorable Judge Roger Prokes, sitting as a special judge in the Circuit Court of Jackson County, from enforcing his order, whereby he excluded all

evidence in *State v. Richard Buchli, II*, Case No. 16CR02–00434. We issued a preliminary writ so prohibiting Judge Prokes ("trial court" or "court").

The issue presented here is whether the State is entitled to the extraordinary remedy of a writ of prohibition based on the trial court's order that sustained, in part, Buchli's motion for show-cause hearing and sanctions. Because the trial court's detailed factual findings (to which we owe deference) support the trial court's order, the State's request for permanent relief in this writ is denied. Ultimately, the State has failed to make the requisite showing before this Court that "the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Anglim v. Missouri Pac. R.R.*, 832 S.W.2d 298, 303 (Mo. banc 1992).

The expansive and egregious history of the violations of the mandatory rules of discovery is indisputable; thus, the only question becomes whether the trial court abused its discretion in the remedy it imposed. We cannot find that under the extreme circumstances of this case that it did. Accordingly, the preliminary order in prohibition is quashed, as improvidently granted, and the permanent writ is denied.

## Factual Background

The State charged Defendant Richard Buchli with first-degree murder and armed criminal action in May 2000, alleging that Buchli murdered his law partner, Richard Armitage, in their office. This writ involves pretrial discovery issues that arose after Buchli's original conviction was reversed and remanded for a new trial. In

the prior proceedings, the motion court granted Buchli's motion for post-conviction relief on the ground that, in failing to disclose exculpatory evidence, the State had violated Buchli's rights under the Due Process clause of the Fourteenth Amendment to the United States Constitution. *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (holding that the non-disclosure of exculpatory evidence violates the Due Process clause). On appeal, this Court affirmed the motion court's judgment. *Buchli v. State,* 242 S.W.3d 449, 456 (Mo.App. W.D.2007).

The case was remanded for a new trial on January 22, 2008, and, on June 6, 2008, Judge Prokes was assigned as a special judge to preside over the retrial. Buchli requested discovery pursuant to Rule 25.03.[1] In February of 2009, one of the assistant prosecutors assigned to the case informed the Court that, due to the misconduct of another assistant prosecutor then assigned to this matter, the parties and the court could not rely on the State's prior discovery responses as being either accurate or complete.

On June 2, 2010, because of a plethora of issues that had arisen pertaining to the State's failure to comply with the rules of discovery (which will be more fully outlined in the analysis section below), Judge Prokes entered a very specific discovery order ("the discovery order").[2] This writ proceeding concerns the details of how and why the State violated this unambiguous discovery order.

The discovery order required the State to produce fifteen specific categories of documents and/or information to Buchli on or before July 20, 2010, and the discovery order required the State to file with the court a statement that it had complied

---

1. Unless otherwise indicated, all rule references are to the Missouri Court Rules (2011).

2. The relevant portions of the discovery order can be found in Appendix A, below.

with the discovery order. Due in part to the State's admission that the prior discovery responses from the State should not be relied upon, the discovery order, among other things, required the State to create a master file of all discovery in this matter.

The State did not comply with the terms of the discovery order and it did not file a certificate of compliance by July 20, 2010, as required. Judge Prokes then sent an e-mail to the parties, stating that he was "assuming discovery ... is proceeding in anticipation of [the] January 2011 court dates.... I want this tried on those dates. If any issue arises that requires my resolution or guidance, please immediately contact me." The State did not respond to this communication.

On August 10, 2010, Buchli filed a motion for a show-cause hearing and for sanctions, requesting that the State be directed to show cause why all evidence should not be excluded by virtue of its failure to adhere to the clear mandates of the discovery order.

On September 8, 2010, approximately fifty days after the State was to have complied with the discovery order, the trial court held a show-cause hearing. The State conceded at the show-cause hearing that it had not complied with the discovery order on or before July 20, 2010, and that it had still not complied, in many respects, with the discovery order as of the show-cause hearing date.

On September 22, 2010, the trial court entered its order, striking all of the State's evidence in this case ("exclusion order"). The court found that the State had failed to comply with paragraphs 1–5, 7, 9–11, and 13–17 of the discovery order.

The State then filed a writ of prohibition, requesting this Court to prohibit Judge Prokes from enforcing the exclusion order. We granted a preliminary writ, and the parties filed legal briefs with this Court.

Further facts will be outlined as necessary in the analysis section below.

## Standard of Review

■■■■ The extraordinary remedy of a writ of prohibition is available: (1) to prevent the usurpation of judicial power when the trial court lacks authority or jurisdiction; (2) to remedy an excess of authority, jurisdiction[,] or abuse of discretion where the lower court lacks the power to act as intended; or (3) where a party may suffer irreparable harm if relief is not granted.

*State ex rel. Mo. Pub. Defender Comm'n v. Pratte,* 298 S.W.3d 870, 880 (Mo. banc 2009). A writ of prohibition will lie when the trial court abuses its discretion during the discovery process. *State ex rel. City of Springfield v. Brown,* 181 S.W.3d 219, 221 (Mo.App. S.D.2005). "Judicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Anglim,* 832 S.W.2d at 303.

■■■ Because we review a trial court's order addressing a discovery violation for an abuse of discretion, we afford the trial court's factual findings the deference required by *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). *State ex rel. Sisco v. Buford,* 559 S.W.2d 747, 748 (Mo. banc 1978). Accordingly, we will accept as true the factual findings that underpin the trial court's order imposing a remedy or sanction for a discovery violation, unless the factual findings are not supported by substantial evidence or are against the weight of the evidence. *Murphy,* 536 S.W.2d at 32.

## Analysis

### Buchli's Due Process Right To Discovery

"The broad rights of discovery afforded criminal defendants by our Rule 25 have constitutional underpinning rooted in due process." *State v. Wilkinson*, 606 S.W.2d 632, 636 (Mo. banc 1980); *see also Merriweather v. State*, 294 S.W.3d 52, 55 (Mo. banc 2009) ("The due process implications of a failure to disclose potentially exculpatory material render Merriweather's claim of a Rule 25.03 violation an issue of 'fundamental fairness.' "). Indeed, compliance with the discovery rules is not discretionary because "the rules of criminal discovery are not mere etiquette but the festoons of due process." *State v. Stapleton*, 539 S.W.2d 655, 659 (Mo.App.1976). "The discovery rules seek to foster informed pleas, expedited trials, a minimum of surprise, and the opportunity for effective cross-examination," and the State's failure to comply with the applicable discovery rules "serve[s] only to thwart these goals." *State v. Wells*, 639 S.W.2d 563, 566 (Mo. banc 1982).

"The basic object of the discovery process in criminal proceedings is to permit [the] defendant a decent opportunity to prepare in advance of trial and avoid surprise, thus extending to him fundamental fairness which the adversary system aims to provide." *State v. Scott*, 647 S.W.2d 601, 606 (Mo.App. W.D.1983). "Where the state has failed to respond promptly and fully to the defendant's disclosure request, the question is whether the failure has resulted in *fundamental unfairness or prejudice to the defendant*." *Id.* (Emphasis added.)

Rule 25 sets forth in detail what items the State "shall" disclose to the defendant. Because it is not seriously in dispute that the State violated Rule 25 in multiple re-

gards, we will not spend time outlining its clear, unambiguous, and well-known mandates. Rather, we will focus on the language pertaining to "Sanctions" in Rule 25.18, which provides the following:

If at ***any time during the course of the proceeding*** it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to make disclosure of material and information not previously disclosed, grant a continuance, exclude such evidence, ***or enter such other order as it deems just under the circumstances.*** Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court. (emphasis added).

### The State Failed To Establish Its Entitlement To The Extraordinary Remedy Of A Writ Of Prohibition

In this writ, the State asserts two Points Relied On in arguing that it is entitled to the extraordinary remedy of a writ of prohibition. The Points will be analyzed in reverse order for ease of analysis. In Point Two, the State argues that the "circuit court erred in concluding that the State had violated parts of the circuit court's June 2, 2010 order."

This Point Relied On is easily resolved because, as previously explained, the State acknowledged at the show-cause hearing that it had violated the trial court's discovery order in multiple respects. Accordingly, in reviewing the transcript of the show-cause hearing, it cannot be disputed that the trial court's findings and conclusions were supported by substantial evidence in the following regard: "This Court finds that the State admitted that it failed to comply with para-

graphs three, four, seven, nine, and ten of the June 2, 2010 discovery order." Order, pg. 21.

In a strange turn of events, the State attempts to "take back" these admissions and concessions it made before the trial court in this writ proceeding, perhaps only now realizing their damning consequences. To give just *one* example, when the trial court inquired into whether the State had complied with paragraph seven of the discovery order, pertaining to the designation of expert witnesses, the State responded as follows: "I don't believe that I—I would have to say we have not. I don't think we could be in complete compliance with that . . . So I believe the answer to that is no." Tr., pg. 41.

 But in this writ proceeding, the State takes a different approach: "The State has identified all potential expert witnesses for trial. It has not designated the specific witnesses it intends to call at trial since the trial is still five months away." Br., pg. 34 (emphasis added).[3] This assertion before this Court is remarkable not only because it illustrates that the State failed to comply with the discovery order in this specific instance, but also because it encapsulates the cavalier attitude the State *still* has in challenging the trial court's authority to issue the underlying discovery order.[4] Multiple additional examples are reflected in a review of the transcript of the hearing below.

Here, there was *substantial* evidence, as the dissent concedes, including the State's own admissions, supporting the trial court's conclusion that the State had violated the discovery order; therefore, the Court could not have abused its discretion in this regard.

Point Two is denied.

Whether the State is entitled to relief from this Court, therefore, hinges solely on its first Point Relied On, wherein the State argues that "the circuit court erred in failing to consider less drastic remedies than the exclusion of all the State's evidence." Although inartfully drafted, the State argues not *only* that the circuit court failed to consider less drastic remedies, but that the court failed to consider and impose less drastic remedies and, thereby, abused its discretion. We disagree.

### The State Has Failed To Meet Its Burden

 As was previously addressed, once a discovery violation has been established, this Court turns to whether the violation resulted in fundamental unfairness or prejudice to the aggrieved party. *State v. Scott*, 647 S.W.2d 601, 606 (Mo. App. W.D.1983). As has previously been explained, we review the State's argument under an abuse of discretion standard. *State ex rel. City of Springfield*, 181 S.W.3d at 221.

"'A writ of prohibition or mandamus is the proper remedy for curing discovery

---

3. The State argues strenuously that the fact the trial date was still five months away constitutes an excuse for its failure to provide much of the discovery to Buchli, but ignores the fact that most of the materials that remain undisclosed as of today have been in the State's possession for over ten years and its failure to properly produce it has resulted in the continuance of four prior trial dates, after the case was remanded by this Court for a new trial.

4. A trial court has inherent authority to issue a discovery order pursuant to Missouri law. *See* Rule 25. But it is worth mentioning that the specific designation of expert witnesses must be made well in advance of trial, so that the defense can obtain its own experts, if necessary, to refute the expert opinions offered by the State.

rulings that exceed a court's jurisdiction or constitute an abuse of the court's discretion.' " *State ex rel. White v. Gray,* 141 S.W.3d 460, 463 (Mo.App. W.D.2004) (quoting *State ex rel. Atchison, Topeka & Santa Fe R.R. v. O'Malley,* 888 S.W.2d 760, 761 (Mo.App. W.D. 1994)). A writ of prohibition is appropriate where necessary to prevent a court from ordering discovery or enforcing motions that constitute an abuse of discretion, cause irreparable harm, or are an exercise of extra-judicial power. *See, e.g., State ex rel. Barker v. Tobben,* 311 S.W.3d 798, 800 (Mo. banc 2010). *State ex rel. Dewey & Leboeuf, LLP v. Crane,* 332 S.W.3d 224, 231 (Mo.App. W.D. 2010). "A trial court 'abuses its discretion if its order is clearly against the logic of the circumstances, is arbitrary and unreasonable, and indicates a lack of careful consideration.' " *Id.* (quoting *State ex rel. Ford Motor Co. v. Messina,* 71 S.W.3d 602, 607 (Mo. banc 2002)).

■ In arguing that Buchli was not "prejudiced by many of the State's violations," the State argues that the "Defendant has the *vast majority* of the evidence in his possession." But the State ignores the detailed factual findings of the trial court that the State (at the show-cause hearing) was unable to articulate, with any certainty, what evidence the State had *in its possession* and what evidence Buchli did not have in his possession. Buchli is entitled to *all of the evidence in the State's possession in order to receive a fair trial.* Therefore, the State's failure to comply with the mandatory rules of discovery has caused a fundamental unfairness *and* prejudiced Buchli. "The trial court is in the best position to assess the prejudicial effect of the failure to disclose and to deter-

mine what remedy was necessary to alleviate any unfairness." *State v. Petty,* 967 S.W.2d 127, 137 (Mo.App. E.D.1998).

■ Here, the trial court's thirty-page order was a veritable catalogue of how the State's discovery violations created fundamental unfairness to Buchli in his ability to receive a fair trial or *even to get to trial,* thus resulting in fundamental unfairness and substantially prejudicing him. This opinion will not attempt to replicate in detail the entire troubling history of discovery violations, because to do so would be impractical in light of its vast and continuous nature, beginning from the time Buchli was first charged in May of 2000 up to and including the show-cause hearing on September 8, 2010. Indeed, this matter was assigned to Judge Prokes as a special judge in 2008 precisely because the State had committed a plethora of discovery and *Brady* violations. The violations included fabricating, misrepresenting and withholding evidence, such that the prior post trial motion court's judgment, which granted Buchli post-conviction relief, thereby setting aside his prior conviction, spanned sixty-three pages.[5]

We shall address only a few of the most recent and compelling issues the trial court faced in this case: In February of 2009, one of the Assistant Prosecutors, who currently represents the State, was assigned to the case. At that time, to his credit, he informed Buchli and the trial court that, based on the misconduct of the prior assistant prosecutor assigned to this case, the State (and therefore Buchli and the trial court) could not rely on the prior discovery responses from the State as being either accurate or complete. At that time, the State represented to Buchli and the trial

---

**5.** A *summarized* version of the history of abuses is included in Appendix B to this opinion because the sheer volume and massive history of the State's egregious discovery violations was a critical consideration by the trial court in determining the sanction it imposed.

court that all discovery would be forthcoming, complete, and accurate.

Over a year later, Buchli was forced to file yet another motion to compel discovery, trying to get what should have been long since disclosed. Then in June 2010, the State responded, not with the discovery that it had promised, but with objections to almost every one of Buchli's discovery requests. Showing an incredible amount of restraint, the trial court did not, at that time, impose drastic sanctions against the State, but instead, pursuant to Rule 25.18, issued its very specific, detailed discovery order of June 2, 2010, in an attempt to compel the State to comply with the rules of discovery, and its prior promises to produce the required materials. This order was ignored by the State. The trial court subsequently sent an e-mail to all parties on July 29, 2010, after the deadline in the discovery order had passed, indicating that he assumed, because he had not been contacted, that all appropriate discovery responses were in compliance. The State ignored the e-mail. When Buchli filed a motion for a show-cause hearing, regarding why the discovery order had not been responded to, the State ignored the motion. When the trial court issued a show-cause order and set the motion for hearing, the State ignored the order. Finally, on the day of the show-cause hearing, the State did not come prepared to show cause why sanctions should not be imposed. The State merely appeared with additional discovery (still not all) and *more promises* to the

trial court as to when the additional discovery *might someday* be provided to Buchli.[6] Ultimately, the trial court did not find these additional promises of the State credible, a finding of fact to which this Court is required to give deference. Only then did the trial court enter its exclusion order imposing the sanctions, from which the State now seeks relief.

One manner in which Buchli is particularly prejudiced, and that has resulted in fundamental unfairness to him, is that today he is no closer to receiving a fair trial than he was when he was originally charged over eleven years ago. Specifically, the State has failed to demonstrate that the trial court abused its discretion in concluding that Buchli may *never* receive his constitutionally guaranteed right to a fair trial. It is indeed troubling, and more than a little bit persuasive, that the State does not respond to the trial court's very specific finding and conclusion that "[a]t this point, this Court is not confident that Mr. Buchli will [ever] receive full disclosures as required by law, *or that this case will ever be ready for trial.*" Order, pg. 30 (emphasis added). The trial court's finding in this regard was supported by substantial evidence based not only on the tortured and thankfully unique history of the case, but perhaps more importantly based on the *current status* of the case.

 The reason for the show-cause hearing was to determine *why* the State had failed to comply with the trial court's

---

**6.** The dissent accepts without question the State's assurance at the show-cause hearing that all undisclosed materials would be provided within one week and concludes that to question this assertion would require this Court to make a factual finding that the individual prosecutors in this case were dishonest. Under our standard of review, it is the province of the trial court and not this Court to make such factual findings. The dissent ignores the fact that it was one of the same individual prosecutors who, in February of 2009, promised the trial court and Buchli full and complete discovery. This was a promise that was not kept and a basis for the trial court to factually conclude that the State had acted in bad faith and further factually conclude that Buchli may never receive full disclosure in this case.

specific order and the rules of discovery and for the State to show cause why sanctions should not be imposed. The *why* was important in determining appropriate sanctions because Rule 25.18 expressly allows the trial court to order "appropriate sanctions" for a *"[w]illful* violation by counsel of an applicable discovery rule or order." (Emphasis added.) "Neither the prosecution nor the defense has the authority to knowingly overrule a direct ruling by the trial court or to intentionally disobey this Court's rules designed to protect the integrity of the process." *Taylor v. State,* 262 S.W.3d 231, 242 (Mo. banc 2008). Willful violations require more serious sanctions than mistaken violations precisely because, among other reasons, they are more likely to cause a "fundamental unfairness" to the opposing party and they show an intentional disregard for the rules and orders of the court rather than a mere negligent violation thereof. Here, the willful violations by the State made it clear at the show-cause hearing, as was found by the trial court, that the State had no intent of bringing Buchli to trial anytime in the foreseeable future. The trial court specifically found bad faith on the part of the State in this case.

Among other things, at the show-cause hearing, the State admitted that *it did not even know which witnesses it planned on calling at trial.*[7] This was extremely problematic because it precluded the State from making truthful representations pertaining to these witnesses in its *most recent* discovery responses, as required by the rules of discovery and the trial court's

specific order. To mention just *one* example relied on by the trial court in issuing its order of sanctions, Rule 25.03(A)(7) requires the state to disclose "[a]ny record of prior criminal convictions of persons the state intends to call as witnesses at a hearing or the trial." The Missouri Supreme Court has held that the duty of the State to use diligence in examining witnesses' criminal backgrounds is paramount. *Merriweather v. State,* 294 S.W.3d 52, 55–56 (Mo. banc 2009). However, in September 2008, the State affirmatively represented that "[t]he state has no information at this time with respect to any felony or misdemeanor convictions which the State's witnesses may have", but, as noted by the trial court, the record is clear that at least one of the State's primary witnesses "has numerous prior felony convictions." Order, pg. 8. This alone would not be so troubling if the State had been forthcoming about the issue.

It was only later that the State "admitted that [its] witnesses had not been run through law enforcement databases," and "[w]ithout having 'run' any witnesses, the state's response that it 'has no information at this time' is a *fraud upon the court and either a misleading or false statement to defense counsel."* *Id.* (emphasis added). As of the show-cause hearing, the State still had not even bothered to "run" the names of the witnesses it was certain to have to call at trial. The State had still not pared down (at all) its previously disclosed list of over 190 potential witnesses that it *might* call at trial.[8] (A list that

---

**7.** The State now relies on its statement at the show-cause hearing, concerning the identity of its witnesses that "I don't know other than to say I believe that it will be, if not identical, certainly similar to the first trial." Tr. 38. This falls well short of compliance with the specific requirements of paragraph 4 of the discovery order.

**8.** The State contended at the show-cause hearing, and contends here, that paragraph 9 of the discovery order only required criminal history checks on witnesses who possessed an expectation of leniency. Paragraph 9 of the discovery order and its sub-parts plainly apply to *all* witnesses the State intended to call at trial. Moreover, the limitation for which the

included every person mentioned in any of the police reports or other documents the State had in its possession.) It seems disingenuous for the State to ask Buchli to prepare for 190 potential trial witnesses when the State is not even willing to take the time to run those names through the computer for prior convictions.

At the show-cause hearing, the State further admitted that *it did not even know what evidence it had in its own possession pertaining to this case.* The following is just an example of some of the relevant findings made by the trial court in this regard:

> [T]he state concedes that the master file it produced is incomplete, in so far as it did not include the volumes of financial records contained in 22 boxes in the prosecutor's control. When this Court asked if the State included all of the required documents, it replied: 'We *believe* this is the master file ... I am *guessing* that it includes the lab reports from the crime lab.' The state's equivocation does not engender much trust that it has confirmed that the documents are a complete record. (emphasis added).

Order, pg. 15–6.[9]

Indeed, the State repeatedly gave equivocal answers to the trial court, which sup-

port the trial court's conclusion that, if the case were tried today, Buchli would not receive a fair trial. At the show-cause hearing, when the trial court went through its discovery order, issue by issue, paragraph by paragraph, in addition to those requirements of the Order to which the State admitted it had failed to comply, the many of the State's responses were qualified or noncommittal.[10] In response to the trial court's question about items in paragraph two of its order, the Prosecutor responded that he *believed* the items were in the master file. In response to paragraph ten, the Prosecutor admitted that he had not personally complied but *thought* that it had been done by others and there was nothing to report; but he then followed up with, *"Maybe there is."* On paragraph twelve, the Prosecutor stated he *believed* he had complied. On paragraph sixteen, he once again admitted that he had not personally complied but *believed* that it had been done by others.

Based on the history of this case, these are not answers upon which the trial court should be expected to rely, *as a matter of law pursuant to Rule 25, in order to ensure Buchli could receive his constitutionally guaranteed right to a fair trial.* Based on the history of this case, there is no excuse why everything was not previously disclosed; further, to the extent any-

---

State argues is undeniably absent from Rule 25.03(A)(7).

**9.** The dissent points out that twenty-two boxes of financial materials were made available to Buchli's counsel a few days before the show-cause hearing and makes note of the fact that Buchli's counsel turned down the opportunity to go through these boxes at the prosecutor's office. Certainly, an offer to sit in someone else's office and review over 20,000 pages of documents within the span of a few days prior to the hearing does not ameliorate the fact these documents were in the State's possession for over ten years and still were not properly disclosed to Buchli.

**10.** It is interesting to note that the "Master file" produced by the State at the show-cause hearing contained 853 pages of material procured from the police department and documents obtained by the police department through subpoenas or other means, but, in September of 2008, the State had produced 1,316 pages of discovery from the police department's file, with the last report dated January of 2008. The State does not attempt to explain what happened to the remaining 463 pages of material.

thing was not disclosed, there is no excuse for there to be any question as to what has and what has not been disclosed. In light of all of the above, the record clearly establishes that there was substantial evidence for the trial court to conclude that *"after 2½ years of what should have been active trial preparation, four trial settings and in the face of a show-cause hearing, the state is unable to articulate with any certainty what their evidence will be or even what documentation it has in its possession."* Order, pg. 30 (emphasis added).

In seeking the extraordinary remedy of a writ of prohibition, the State still fails to suggest any future timeline as to when it will *actually produce the entire discovery to Buchli or when it will comply with the mandatory rules of discovery.* Indeed, the State's failure in this writ to even recognize that it has, in fact, violated the rules of discovery and the trial court's order (see Point II), leads to the conclusion that Buchli will continue to be indefinitely prejudiced by the State's fundamentally unfair refusal to disclose required information, in violation of his due process rights. In seeking the extraordinary remedy of a writ of prohibition, the State argues that "the circuit court's focus should be on removing the prejudice that the other party suffers because of the party's violation." Br., pg. 9. But, as explained above, this is precisely what the trial court's order of sanctions did, in light of the Court's conclusion that Buchli will never receive his constitutionally guaranteed right to a fair trial, a conclusion which is clearly supported by the evidence.

Simply put, the State is not entitled to the extraordinary remedy of writ of prohibition because its conduct has clearly created fundamental unfairness and prejudiced Buchli. When this very Court affirmed the motion court's order setting aside Buchli's conviction in 2007, based on a plethora of outcome determinative discovery violations caused by the State alone, it was beyond the pale of imagination that the *State* would come back to this Court, four years later, complaining that *its additional discovery abuses in the same case* somehow entitled the State to relief from this Court (mostly due to the failure to disclose material that was in the State's possession long before 2007).

But with this as a backdrop, the State argues at length before this Court that its conduct as it pertains to discovery did not constitute "bad faith." These arguments are misguided for two reasons. First, nowhere in Rule 25.18 (or in any Missouri case law) does it require the trial court to find "bad faith" before entering sanctions "as it deems just under the circumstances." [11] But even if Rule 25.18 did contemplate such a "bad faith" *requirement,* the record is replete with instances of the State's bad faith as outlined above. "The prosecutor's purposeful decision not to comply with the order or reveal his decision not to produce the document to the court simply *is not an error that can be made in good faith." Taylor,* 262 S.W.3d at 242 (emphasis added). Therefore, the following findings and conclusion

---

11. We note that, to an important degree, the trial court's order of sanctions does not simply impose the relief that the court "deems just under the circumstances." Instead, as Judge Prokes noted, the exclusion of the State's witnesses, whom the State failed to adequately disclose as required by paragraphs 3, 4, 8, 9 and 15 of the discovery order, was a sanction separately and specifically authorized by the provisions of Rule 25.18 which empowers the court to "exclude such non-disclosed evidence." To this extent, Judge Prokes imposed a sanction specifically targeted to the State's conceded discovery violations.

of the trial court are neither arbitrary nor erroneous and are clearly supported by the record:

> [T]his Court is compelled to rule that the disregard of this Court's order of June 2, 2010 compounded by the history of the Office of the Jackson County Prosecutor, as it pertains to *St. v. Buchli,* in its failure to comply with Supreme Court Rule 25.03, Local Rule 32.5, and this Court's June 2, 2010 order does constitute bad faith.

Order, pg. 14.

The State further argues that the trial court must "regulate discovery in a manner that is fair to both the defendant and the state." Based on the above conduct of the State which was found to and did constitute "bad faith," it is ironic that the State now argues that the trial court's order ameliorating the prejudice and unfairness to Buchli is somehow "unfair" to the State.

One purpose of the Rules of Discovery is to "expedite trials." *State v. Wells,* 639 S.W.2d 563, 566 (Mo. banc 1982). As found by the trial court, the State's violations of the rules of discovery have caused four prior continuances of trial settings, and the most recent violations would have required a fifth continuance of a trial setting, all since this matter was remanded for a new trial in 2008. While Buchli's motion for a speedy trial is not currently before this Court, we may consider the delay caused by the State's discovery violations in determining whether fundamental unfairness or prejudice has flowed to Buchli. Here, we conclude that the delay caused by the State's discovery abuses have caused both to occur to Buchli.

 Finally, the State and the dissent argue that "the need to conserve [judicial] resources" has no bearing on whether the trial court was warranted in issuing its order of sanctions. This argument cannot be sustained. As previously explained, Rule 25.17 was designed, among other things, to *expedite the trial process.* It is only logical that the judiciary has the inherent power to impose severe sanctions in this context:

> Preliminarily, we note that it is now clear that a federal court has the inherent power to sanction for conduct which abuses the judicial process. This power is governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases. Moreover, pursuant to this power, a court may impose the severe sanction of dismissal with prejudice (or its equivalent, judgment) if the circumstances so warrant.

*Barnhill v. U.S.,* 11 F.3d 1360, 1367 (7th Cir.1993) (citations omitted).

Trial courts must be allowed discretion to control their own dockets or other cases and parties suffer by not being allowed their timely day in court. Judge Prokes was a visiting judge, transferred from another circuit, to hear this case in Jackson County. He noted that this case had been set for trial at least four times since he had been appointed by the Supreme Court to hear the matter, following the remand. Each time it was set he had to clear his docket in his home circuit for three weeks, causing delays in other matters that also needed and deserved to be heard. Eliminating the equivalent of twelve weeks from the calendar of the only circuit judge in a five county circuit is difficult, to say the least, and places an extreme hardship on the parties to criminal and civil litigation in that circuit, as well as on the other judges of that circuit. Our Supreme Court has adopted Court Operating Rule 17 to provide time standards to ensure prompt and fair disposition of cases. *See* Rule 17.01.

The goal of Rule 17 is to have ninety-five percent of all felony cases decided within *fourteen months*. In this case, it has been over eleven years since the charges were filed and over four years since the case was remanded for a new trial. When "judicial resources" are considered, it is not the effect on the individual judge, as suggested by the dissent, but the effect on the other litigants in other cases, who are awaiting their day in court, that becomes paramount.

Based on the substantial evidence that supported the trial court's order of sanctions, as expressly permitted by Rule 25.18, the State's first Point is denied because it has failed to demonstrate that it is entitled to relief. We find, on the record before this Court, that the trial court did not abuse its discretion in the sanction that it imposed.

### Response to the Dissent

■ Citing the concurring opinion of Judge Holliger in *State v. Allen*, 81 S.W.3d 227, the dissent argues that the same considerations and analysis apply whether discovery violations are made by the State or the Defendant. While both the State and the defendant have a right to discovery, "[n]evertheless, when fashioning remedies, the court must remember that one of the fundamental rights of due process afforded to a defendant is 'the right to present witnesses in his defense[.]' " *State v. Simonton*, 49 S.W.3d 766, 781 (Mo.App. W.D.2001) (quoting *State v. Allen*, 800 S.W.2d 82, 86 (Mo.App. W.D.1990)). The Missouri Supreme Court urged caution in excluding the testimony of defense witnesses in *State v. Mansfield*:

The remedy of disallowing the relevant and material testimony of a defense witness essentially deprives the defendant of his right to call witnesses in his defense. This is not to say it should never be done, but it is certainly a drastic remedy that should be used with the utmost caution.

637 S.W.2d 699, 703 (Mo. banc 1982).[12] The dissent's argument ignores the fact that the same due process concerns do not apply when the State is being sanctioned precisely because the State does not have due process rights.

Further, the dissent properly points out that ultimately justice is something that benefits society at large, but we must reject its conclusion that "the citizens of this State have been substantially prejudiced by the remedy imposed by the trial court for violation of the discovery order." Rather, the citizens of this State (and certainly the victim's family) have been prejudiced by the prosecutors' misconduct throughout this entire matter. Due to the abuses by the State, the citizens of the State and the victim's family are no closer to knowing the truth about the events of the murder and the person responsible than they were the day that it occurred.[13]

Without citing any authority for doing so, the dissent balances the prejudice to Buchli as a result of the discovery violation against the prejudice to the State as a result of the discovery sanction imposed. The "balancing test" employed by the dissent is predisposed to an outcome in favor of the State based on the improper assumption that the State's overriding interest should be to prosecute and convict Buchli. Such is not the case.

---

**12.** *Overruled on other grounds by State v. Clark*, 652 S.W.2d 123 (Mo. banc 1983).

**13.** There is unquestionably a societal interest in prosecuting cases of murder, but this does

not give the State free reign to prosecute *this defendant* for an indefinite period of time, no matter how many decades it takes the State to comply with its legal obligations.

■ The Supreme Court of the United States recently reaffirmed the long-standing principle that "[t]he role of a prosecutor is to see that justice is done." *Connick v. Thompson*, — U.S. —, 131 S.Ct. 1350, 1365, 179 L.Ed.2d 417 (2011) (citing *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Moreover, a prosecuting attorney in a criminal case acts as a quasi-judicial officer representing the people of the State; his duty is not to convict at any cost but to see that justice is done *and* that the accused receives a fair and impartial trial. *State v. Massey*, 867 S.W.2d 266, 270 (Mo.App. E.D.1993). Indeed, the United States Supreme Court stated in *Brady* that the principle behind its holding was "not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of administration of justice suffers when any accused is treated unfairly." *Brady*, 373 U.S. at 87, 83 S.Ct. 1194.

Moreover, the fact that serious charges are involved should weigh more heavily in favor of Buchli, if such a balancing test were to be employed, simply because he is the only party with a liberty interest in the pending criminal litigation. The fact remains that trial courts routinely impose sanctions that impair a client's substantive rights because of the attorney's conduct and actions. Here, the dissent gives credence to the theory that the trial court must be *more* forgiving of the State's incompetence and/or misconduct when the criminal charges are more serious, but this standard acts to immunize the State during prosecutions of serious offenses regardless of the State's conduct.

■ When an individual's liberty interest hangs in the balance (in this case the potential of a life sentence without parole), the trial court must be empowered to do what is expressly allowed by Rule 25.18 in sanctioning the State through "enter[ing] such other order as it deems just under the circumstance." The dissent's approach would render this portion of Rule 25.18 a nullity through micromanaging what the trial court may or may not consider in issuing sanctions.

The dissent suggests that the "trial court considered and rejected the Rule 25.18 options for remedying a discovery violation of ordering disclosure materials and information not previously disclosed, [and] of granting a continuance." But here the trial court had previously employed both of these techniques, on multiple occasions, in an attempt to compel the State to comply with the *mandatory* rules of discovery, but to no avail. The dissent fails to articulate how many violations is enough before the trial court is empowered to enforce the rule of law.

### Conclusion

Based on the entire history of this matter, if this case does not qualify for the ultimate sanction, one cannot fathom how any court could ever impose the sanction imposed in this case. Therefore, we conclude that the trial court did not abuse its discretion herein. Accordingly, the preliminary order in prohibition, heretofore issued, is quashed, as improvidently granted, and we deny the State's writ.

LISA WHITE HARDWICK, Chief Judge, Presiding, JAMES M. SMART, JR., JOSEPH M. ELLIS, VICTOR C. HOWARD, JAMES E. WELSH, ALOK AHUJA, MARK D. PFEIFFER, Judges, Concur in the Majority Opinion Judge

KAREN KING MITCHELL in a dissenting opinion is joined by Judge CYNTHIA L. MARTIN.

Judge THOMAS H. NEWTON, Recused.

### Appendix A

The trial court's discovery order directed the State to disclose the following:

"To provide both the parties and the Court with certainty that the discovery requirements of Supreme Court Rules 25.03 and 25.04 and Local Rule 32.5 have been complied with, the Court enters the following discovery ORDER.

1. The State shall provide to defense counsel copies of all documents and other evidence regarding the charge against the Mr. Buchli in the possession of the prosecuting attorney, in the possession of the investigating agency or agencies, or within the possession or control of any other government personnel involved in the investigation of this case or under control of the prosecutor; copies of any additional documents or evidence not previously provided are to be provided to defense counsel within seven days following the generation of the new document or evidence. *See Merriweather v. State,* 294 S.W.3d 52 (Mo. banc 2009).

a. The State shall prepare a master file of all police reports, investigative reports, or other documents generated by investigative agencies in connection with the charge against defendant;

b. The master file shall be Bates stamped or otherwise sequentially numbered;

c. Duplicate copies of reports shall not be included;

d. Defense will not be responsible for cost of preparation.

2. The State shall supplement the response to paragraph 1 above with copies of any additional statements, testimony, or interviews of witnesses to be called in the trial of this case by the state or of anyone who provided exculpatory information not a part of the master file, which can include depositions, trial or hearing transcripts in which the defendant did not participate, or witness interviews not contained in the master file.

a. The State shall provide copies in the possession of the prosecuting attorney, in the possession of the investigating agency or agencies, or within the possession or control of any other government personnel involved in the investigation of this case or under control of the prosecutor of any other statements of witnesses, such as hand-written notes of interviews, letters, e-mails, or any other documents. These additional statements shall be sequentially numbered;

b. The State is reminded that interviews or communications not reduced to writing must be disclosed if such interview or communication provides impeachment information, conflicts with earlier statements, or would be otherwise discoverable.

3. The State shall update the addresses of all previously endorsed witnesses. If an endorsed witness cannot be contacted, the State will note that the last known address cannot be confirmed, and that there are no newer addresses.

4. The State shall provide a trial witness list (which can be amended without leave of court until September 1, 2010, and thereafter with leave of court), identifying the names and last known addresses of persons whom the state *intends to call* as witnesses at trial, together with their written or recorded statements, and existing memoranda reporting or summarizing part or all of their oral statements.

a. Supreme Court Rule 25.03(A)(1) specifically requires the disclosure of witnesses "the state *intends* to call." A list of every single individual whose name appears within case records shall not suffice to comply with this order;

b. The state shall provide updated address or other contact information within 7 days of such information being provided to the state or other government personnel;

5. The State shall disclose any written or recorded statements and the substance of any oral statements made by Mr. Buchli, a list of all witnesses to the making or the acknowledgment of such statements, and the last known addresses of such witnesses;

a. As required by Supreme Court Rule 25.03(A)(2), the state shall identify with specificity all statements made by Mr. Buchli, a list of all witnesses to the making and/or acknowledgment of such statement(s) and the last known address of such witnesses;

b. A reply that states: "The Defendant may have made statements to witnesses during the commission of the crime" does not comply with Rule 25.03(A)(2) or this order;

6. The State shall disclose those portions of any existing transcript of grand jury proceedings which relate to the offense with which Mr. Buchli is charged, containing his testimony and/or testimony of persons whom the state intends to call as witnesses at a hearing or trial;

7. The State shall designate any experts it intends to call at trial or hearing, and disclose any reports or statements of experts made in connection with the particular case, including but not limited to the results of physical or mental examinations, bench notes, drawings, diagrams, photographs, peer reviews and the results of scientific tests, experiments, or comparisons.

a. Consistent with Rule 25.03 and Local Rule 32.5, all documents received by, reviewed by, produced by, or sent by any expert are to be produced in discovery;

b. Handwritten notes, bench notes, or any other documents are to be produced in discovery.

8. The State shall provide an exhibit list no later than 7 days before trial, specifically listing any books, papers, documents, photographs, or objects which the state *intends to introduce into evidence* at the trial. The State shall provide a list of any items "which were obtained from or belong to the defendant;" when answering the balance of the discovery requests per this order.

a. A description of broad categories, such as "all photographs", does not comply with this request or Supreme Court Rule 25.03(A)(6); the Rule requires specifically identified items that the State intends to introduce at a hearing or trial;

9. The State shall disclose any record of prior convictions or pending charges in which the witness has an expectation of leniency of persons endorsed by the state as a witness;

a. Records of showing prior convictions must be provided to defense counsel;

b. A response that "The State has no information at this time with respect to any felony or misdemeanor convictions which the State's witnesses may have" is an affirmative statement that the State has used diligence to run each witness on computerized databases, and such database runs are to be provided in discovery;

c. The State shall provide a statement that all endorsed witnesses were "run", and the date that such search was completed.

10. The State shall provide any record of prior criminal arrests and/or convictions, pleas of guilty, or findings of guilt of Mr. Buchli.

a. The state has access to criminal history that defense counsel does not. Defendants frequently are unaware or misinformed as to their criminal history, and such information is critical in case evaluation;

11. The State shall provide any arrests, police contacts or pending criminal charges against a witness the State intends to call at a hearing or the trial, where any deal exists between that witness and the government;

a. The State shall disclose such information during the pendency of this case, *i.e.* arrests or dispositions concerning 2000 to the present.

b. Pursuant to *State ex rel. Engel v. Dormire*, 304 S.W.3d 120 (Mo.2010) the state is required to disclose any deals or favorable treatment provided by any governmental personnel.

12. The State shall disclose any photographic or electronic surveillance (including, but not limited to, wiretapping, patrol car or patrol wagon videos, booking videos, surveillance videos), in connection with the offense with which Mr. Buchli is charged, or of conversations to which he was a party or of his premises; defense counsel will provide media for copying if requested.

13. The State shall disclose any material or information, within the possession or control of the state or other governmental personnel, which tends to negate Mr. Buchli's guilt as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment. *See State ex rel. Engel v. Dormire*, 304 S.W.3d 120 (Mo.2010).

a. Rule 25.03(C) requires "that the state shall use diligence and make good faith efforts" to disclose material or information in the possession of other governmental personnel;

14. The State shall disclose any exculpatory information under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

15. The State shall disclose any impeachment information concerning victims, witnesses, agencies, departments, or organizations involved with the charge against Mr. Buchli; Such information includes, but is not limited to:

a. Material or information concerning the alleged victim concerning theft, dishonesty, drug usage, mental treatment, charges or complaints; reputation for violent, turbulent or bizarre behavior, *see State v. Gonzales*, 153 S.W.3d 311 (Mo.2005); specific acts of violence or assault;

b. Material or information concerning any witnesses that would serve to impeach the credibility of the witness, including but not limited to:

i. Information concerning theft, dishonesty, false statements, perjury, drug usage, alcohol abuse, mental treatment, charges or complaints, disciplinary proceedings, memory impairment, vision impairment, payments or inducements for testimony or status as a witness;

ii. particularly with police or expert witnesses, prior testimony, depositions, or investigations that provide impeachment material.

c. Certification or peer review documentation concerning individual witnesses;

d. Any disciplinary proceedings against experts, police officers, police personnel, lab personnel who will testify or on whose work testimony will be based or others relating to their competency or truthfulness.

16. The State is directed to make a diligent and good faith effort to obtain any of the above items or information which may be in the possession or control of any other governmental personnel, under the authority of Rule 25.03(C).

17. The State is directed to comply with this Order on or before July 20, 2010 and file with the Court a statement that it has complied with this Order."

Emphasis original.

### Appendix B

To appreciate the posture of this case when the trial court ruled that the State had violated the court's discovery order and imposed sanctions for those violations, an abbreviated history of the discovery violations and other bad acts of the State in this case is essential. The following is a chronology:

1) Buchli's discovery request, filed May 25, 2000, was answered by the State sixty-eight days late. Included in its response, the State endorsed in excess of one hundred and ninety witnesses whom it "intended to call at trial," but the State failed to list complete names or addresses for many of those endorsed witnesses.

2) On August 22, 2000, Buchli filed a motion to compel discovery, based on his failure to receive certain scientific evidence and other records and video surveillance tapes.

3) On February 13, 2001, Buchli filed a second motion to compel discovery, specifically looking for financial records upon which the State based its theory that the murder was financially motivated. The State failed to respond to this motion.

4) On March 20, 2001, the State requested a continuance based on the need to conduct additional investigation. The court denied the request noting that the State's application was "woefully inadequate," "flimsy," and "without evidence or factual support." Buchli objected to the continuance and requested dismissal of the charges in violation of his right to a speedy trial.

5) On March 22, 2001, Buchli filed another request for disclosure based upon material listed in a search warrant that had not been disclosed. The State failed to respond to this motion.

6) On March 29, 2001, Buchli again filed a request for the previously requested financial documents. The State dismissed the charges that day.

7) On January 23, 2002, the State again indicted Buchli, this time for first degree murder rather than second degree murder. The next day Buchli filed a discovery request and a speedy trial request.

8) On February 5, 2002, Buchli filed three motions for disclosure of evidence. The first was for evidence from any investigation that had occurred between the dismissal of the first charges and the refilling of charges. The second motion sought a specific statement from a witness who was listed in a search warrant application and had not been previously disclosed. The third sought material regarding a motion to suppress evidence based on a search warrant application that relied on evidence not previously disclosed and contained a letter from a

police sergeant directing police personnel not to speak to a defense investigator.

9) On February 14, 2002, the State filed objections to Buchli's discovery requests and a request for an extension of time to answer because its deadline had passed. In that response, the State claimed that there was no exculpatory evidence in its possession, which was later found to be untrue. The State finally provided partial discovery answers seventeen days late.

10) In May 2002, a deposition of blood spatter analyst, Linda Netzel, was scheduled by Buchli. Prosecutor Amy McGowan canceled the deposition, claiming that the witness had no new information since her deposition was taken two years prior. Later, when Netzel was finally deposed, it was discovered that she had in fact done additional blood spatter testing, *at the request of the prosecutor*, and that the testing was videotaped and photographed, but she prepared no written report, in an apparent attempt to avoid the rules of discovery.

11) On July 30, 2002, Buchli was convicted and sentenced to life imprisonment. This conviction was affirmed by this Court in 2004.

12) In 2005, following a post conviction relief hearing, the trial judge vacated Buchli's sentence and found, among other things, that the State failed to disclose evidence of the unaltered surveillance videotape from the building where the crime occurred. That videotape proved that the State's witness, Paul Hoglen, committed perjury, and the credibility of other of the State's witnesses was damaged by the undisclosed videotape that demonstrated that Buchli had an extremely short window of time to commit the murder in question.[14] Further, the State had allowed Buchli and the Court to falsely believe the videotape had been destroyed. The trial court found that the State's disclosures and discovery responses were "ambiguous, inaccurate, and incomplete."

In its Findings of Fact and Conclusions of Law setting aside Buchli's conviction, the motion court made numerous findings that the State had acted in bad faith in failing to disclose material evidence to the defendant and in allowing State's witnesses to testify falsely. To give just one example, the motion court concluded that "Ms. McGowan admits that she sat silent, and did nothing to correct the false and misleading testimony given by Detective Woods during John O'Connor's cross-examination of the witness."

13) On June 6, 2008, after the case was remanded for a new trial, the cur-

---

**14.** In affirming the motion court's order setting aside Buchli's conviction, this Court concluded the following pertaining to this videotape:

Exhibit 134 would have provided Buchli with plausible and persuasive evidence to support his theory of innocence by supporting his theory that he did not have enough time to commit the crime. If believed, this evidence would have established that Buchli had only three and a half minutes to club Armitage nine times with a blunt object,

clean any blood from himself, and get down 13 floors to leave the building. Although the jury was free to believe that Buchli could have done all of these acts in less than four minutes, Buchli conceivably could have used Exhibit 134 to persuade the jury that the "time window" was too brief. Exhibit 134 puts the case in such a different light and "undermine[s] confidence in the verdict."

*Buchli v. State*, 242 S.W.3d 449, 455 (Mo.App. W.D.2007) (internal citations omitted).

rent trial judge was assigned to hear the matter.

14) Based on the special history of this case, the parties agreed to an expedited trial setting for this matter on January 20, 2009. In July 2008, defense counsel noted for the record that discovery had not yet been completed by the State, and the trial court noted that "Discovery is ongoing." Order, pg. 6

15) On September 9, 2008, Prosecutor Dan Miller filed a response to discovery, which was supplemented on October 6th and October 22nd. The response was inadequate in multiple respects. Among other things, the "state listed 1,314 pages of police reports (which defense counsel has stated was filled with duplicate copies of the same reports)." Order, pg. 6. The State did not list the witnesses it intended to call at trial, but simply listed "the same witness list from 2000 that appears merely to recite names found in the various discovery documents." *Id.* Furthermore, it stated, in regard to the criminal history of witnesses, that the State "has no information at this time." It was confirmed by the State two years later, on September 8, 2010, that the State had no information because it never bothered to run the names of the witnesses through the computer. The court found this to be a fraud on the court and a misleading or false statement to Buchli. It was confirmed that at least one of the State's witnesses, Paul Hoglen, had numerous undisclosed felony convictions.

As it pertains to expert witnesses, the State failed to provide any reports or statements of its experts (as required by Rule 25.03(A)(5)). "Instead of complying with this rule, the State simply lists seven expert witnesses. Notably, the state's response does not include the name of John Wilson, an expert who *testified* for the state during Buchli's trial concerning the results of scientific tests he conducted. Mr. Wilson has both conducted scientific tests and given a statement-testimony under oath-and that must be disclosed, irrespective of whether the State intends to call him as a witness." *Id.* pg. 7.

As it pertains to statements made by Buchli, the State failed to comply with Rule 25.03(A)(2) by merely responding that " 'The defendant made statements to the witnesses as documented in the reports provided in discovery. The defendant spoke with police officers on May 5, 11, and 23, 2000. Copies of the reports of those statements have previously been provided in discovery.' This was not a proper and full response." Order, pg. 6–7.

As it pertains to evidence that was "obtained from or belong to the defendant," the State "has represented to the Court and defense counsel it possesses 22 boxes of undisclosed records that contain, in part, financial records of Mr. Armitage and the Armitage/Buchli law partnership, 'obtained from or belong to the defendant.' " *Id.* at 7. "These boxes have not yet been catalogued and appropriately deliver to the defense as per discovery request. No information has been revealed as to what documents and other property are that of Mr. Buchli." *Id.* 7–8.

Rule 25.03(A)(8) requires the state to disclose "If there has been any photographic or electronic surveillance (including wiretapping), relating to the offense with which the defendant is charge [ . . . ]" "The state responded that 'No photographic or electronic surveillance was conducted relating to this offense.' This response is suspect when reference is made to the post-conviction

proceeding in which the surveillance video showing Mr. Buchli's premises and the movements of Mr. Buchli himself are of central importance. Furthermore, as revealed on September 8, 2010, the state additionally possessed bank surveillance videos that it had never before disclosed." *Id.* at 8–9.

Rule 25.03(A)(9) requires the disclosure of "[a]ny material or information, within the possession or control of the state, which tends to negate the guilt of the defendant as to the offense charged, mitigate the degree of the offense charged, or reduce the punishment." "The state did not respond in any fashion. Again this appears to be an inaccurate response in light of Judge Midkiff's findings of fact and conclusions of law [pertaining to Buchli's successful motion for post-conviction relief]. She stated repeatedly that Exhibit 134, the original, complete surveillance video which was not produced by the state, is "exculpatory evidence." Then, Judge Midkiff noted that, prior to the original trial, despite repeated attempts by trial counsel to get discovery, the state failed to disclose '[a]ny material or information, within the possession or control of the state, which tends to negate the guilt of the defendant.' Judge Midkiff found that the state's response—'[t]o date, the investigation has produced *no* exculpatory evidence'—was false and misleading. (Midkiff Order, page 14, emphasis in original.) Four years later, despite a judicial finding of fact to the contrary, the same prosecutor's office again failed to list any evidence that "tends to negate the guilt of the defendant." Order, pg. 9.

16) On October 14, 2008, the State supplemented its discovery, adding eight new witnesses including several from "BDK Accounting." However, there was still no financial material disclosed to Buchli. It also included three new crime lab experts, but the State failed to disclose any reports of these experts.

17) On December 2, 2008, the State disclosed that it was having additional blood spatter testing and other microscopic analysis performed.

18) On December 17, 2008, Buchli requested a continuance of the January trial date because of the State's as yet undisclosed forensic testing, missing discovery from the first trial, and post remand missing discovery.

19) On December 19, 2008, at a hearing, the State indicated that it would complete its testing and provide all discovery in early January 2009. Following that hearing, the trial court issued a detailed order setting forth a schedule for completion of testing (by January 20, 2009) and full disclosure to Buchli (by May 21, 2009) and required the State to copy the order to the head of the crime lab.

20) Trial was reset for September 8, 2009.

21) On January 20, 2009, the State requested an extension of time to transfer a security video tape to a DVD. "This is the same video that Judge Midkiff found to be exculpatory evidence withheld from the defense in the first trial." Order, pg. 11. The court noted that the State had possessed this tape since May of 2000, but granted the State additional time.

22) On February 24, 2009, the State informed the court that Dan Miller had been removed as a prosecutor on the case, based upon a finding in another matter, that Dan Miller had "knowingly and intentionally withheld" over one-hundred pages of police reports in that case and committed a fraud on the court.

The State represented to the Court that they could not rely on the discovery previously provided by Dan Miller and would have to redo the discovery to ensure that everything was disclosed. The trial court, noted that the allegations of discovery impropriety against Mr. Miller were first raised on February 8, 2007, long before he was assigned to the case at bar.

23) On July 13, 2009, the State advised the court that, contrary to prior assertions, there were twenty-two boxes of discovery that had not been disclosed to Buchli. The trial date was continued to March 22, 2010.

24) On February 3, 2010, Buchli again requested a continuance of the trial date, based on the lack of full disclosure by the State. The trial was continued to January 18, 2011, and the trial court indicated that this date was "firm."

25) On May 10, 2010, Buchli filed a new request for discovery. By e-mail the trial judge asked the State if they were going to respond to the latest request. The State indicated they were in the process of filing a response to the discovery and would have it on file by May 28, 2010. The response was filed late on June 2, 2010, and, instead of providing material and information to Buchli, the State objected to almost every item requested by Buchli.

26) On June 2, 2010 the court then issued the discovery order that gave rise to the current dispute.

KAREN KING MITCHELL, Judge.

### DISSENTING OPINION

I respectfully dissent. The question presented here is: did the circuit court abuse its discretion in dismissing first-degree murder charges as a sanction for the State's noncompliance with a pretrial discovery order when the record does not support a finding that the State's noncompliance prejudiced the defendant? The answer is "yes." Accordingly, I would make absolute our preliminary writ of prohibition.

On June 2, 2010, Judge Prokes entered a discovery order ("the discovery order"), requiring the State to produce fifteen specific categories of documents and/or information to the defendant, Richard Buchli, on or before July 20, 2010, without regard to whether some or all of the documents or information had already been produced. The order also required the State to make a diligent and good-faith effort to obtain information responsive to the discovery order that may be in the possession or control of certain other governmental agencies and personnel. Finally, the order required the State to file with the court a statement that it had complied with the order.

On August 10, 2010, Buchli filed a motion for a show-cause hearing and for sanctions, requesting that the State be directed to show cause why all evidence should not be excluded by virtue of its failure (1) to produce a master file of discovery; and (2) to otherwise adhere to the discovery order. In analyzing the circuit court's action in this case, it is important to note that, although, like many cases, there had been ongoing discovery disputes in this case, the August 10, 2010 motion was the first time that Buchli had filed a motion for discovery sanctions in the post-remand case.

On September 8, 2010, the trial court held a show-cause hearing. By the time the September 8, 2010 hearing had ended, the trial court had taken an action that, as far as research reveals, is unprecedented: it issued a de facto dismissal [15] of first-

---

**15.** No one disputes that the trial court's order had the practical effect of dismissing the

degree murder charges as a sanction for discovery violations, when there was no allegation (much less a record) of a constitutional violation of the defendant's right to a fair trial.

At the hearing, the Prosecutor[16] brought what he termed as a "master file," which purportedly contained everything the prosecutor's office had in the case, with the exception of certain financial documents. The master file was comprised of three components.

First, the Prosecutor indicated that he was providing the complete police file. "We are representing to the court that we have asked the police department for every page. We have numbered it and we have produced it." This included 853 pages of material containing reports prepared by the police and documents obtained by them through subpoena and other means. The Prosecutor also indicated that he believed the defense had had all of these documents for some period of time. Buchli's attorney did not contest this representation, though he noted that he could not confirm, without an opportunity to review the records, that the Prosecutor's representation was accurate.

Second, the Prosecutor stated that the master file included 4,350 pages of financial documents, medical documents, and other relevant paperwork that was not a part of the police department's file. The Prosecutor indicated that he believed these records had been previously provided to the defense. Buchli's attorney did not contest this representation, but he again

noted that he could not confirm, without an opportunity to review the records, that the representation was accurate.

Third, the Prosecutor provided twelve compact discs: three discs containing crime scene photographs from different crime scene technicians; eight discs of video surveillance (including ATM and bank surveillance, all litigation support videos, and video that had been enhanced by the crime lab); and one disc that included a complete record of all of the crime lab's files (including bench notes).

The Prosecutor indicated that "that is the extent of everything that we have in our files." He represented further that the bulk of the documents contained in the master file had previously been produced. Again, Buchli advised he could not confirm the accuracy of the Prosecutor's statement without reviewing the records.

In addition to the master file present with the Prosecutor at the show-cause hearing, the Prosecutor identified a fourth category of documents. The Prosecutor characterized these as other financial documents that were not pertinent to the opinion of any expert or otherwise relevant to the case against Buchli.[17] Nevertheless, the Prosecutor acknowledged that the documents should have been produced as they were within the scope of the discovery order. The Prosecutor did not bring this fourth category of documents to the show-cause hearing. The Prosecutor advised that these financial documents had been made available to Buchli's attorneys for review in advance of the show-cause hear-

---

charges. We recognize that the court did not literally dismiss the charges, but, for the sake of convenience, we will at times refer to the charges as having been dismissed.

**16.** At the show-cause hearing, the State was represented by an assistant prosecutor and a special assistant prosecutor. This dissent will

refer to them, collectively and individually, as "the Prosecutor."

**17.** It appears that these financial documents are twenty-two boxes of records seized from Buchli's office, the existence of which the Prosecutor had previously disclosed to the court and to Buchli.

ing but that Buchli's attorneys had declined the Prosecutor's invitation to review the documents. The Prosecutor acknowledged that making documents available for review did not satisfy the State's obligation under the discovery order to produce the documents. Thus, the Prosecutor advised the court that he would have these documents numbered and copied within one week and would produce them to Buchli at that time.

In explaining the failure to comply with the order by July 20, 2010, one prosecutor represented to the court that he had engaged in discussions with Patrick Peters, one of Buchli's attorneys, regarding the discovery order. The Prosecutor represented that he had discussed with Peters personal circumstances that he was dealing with in the summer of 2010 and that "Mr. Peters told me, fine, do that, this will take care of itself[,] and we will take care of it." Peters confirmed that the conversation occurred but stated that the defense never agreed that it would accept noncompliance with the discovery order. Peters also stated that, if the Prosecutor had actually requested an extension, he would not have objected to it, but that the Prosecutor had never made such a request.

The trial court expressed admiration for both prosecutors. However, the court sustained Buchli's motion for sanctions and ordered that "the evidence" be stricken. The Prosecutor then moved for an evidentiary hearing to establish precisely what evidence "has been produced prior to today and everything we have produced." Peters argued that it was too late for such a hearing; the trial court agreed and overruled the motion.

The Prosecutor asked for a clarification: "are you ruling that even the evidence that has been previously produced by counsel is excluded or are you ruling that if there is additional stuff that was produced today

that was not previously produced, that is excluded?" Judge Prokes responded that "I am ruling that *everything* is [excluded] because we didn't know whether it was produced or not." (Emphasis added.) The Prosecutor asked again whether the order was "[t]hat we would be prevented from presenting any witnesses or any evidence at the trial of this case," to which Judge Prokes responded "yes."

On September 22, 2010, the trial court entered its order, prohibiting the State from introducing any evidence in this case ("exclusion order"). The court found that the Prosecutor had failed to comply with paragraphs 1–5, 7, 9–11, 13–15, and 17 of the discovery order.

In addition, despite his previous statement to the contrary, Judge Prokes found that, upon further reflection and review of the Prosecutor's conduct over the history of this case, the Prosecution had acted in bad faith.

In fashioning a remedy for the Prosecutor's conduct, the exclusion order stated that the trial court was "mindful of its options, and will only craft a remedy to ensure fairness to all parties." The court then found that ordering the evidence disclosed would be pointless, because it had already done that by issuing the discovery order. The court found further that continuing the trial date would waste judicial resources. The court found that the only remedy would be to exclude evidence.

The trial court then considered whether to exclude *only* the evidence that had not been made available to Buchli prior to the July 20, 2010 discovery cut-off date. It found that that option would not be fair to Buchli because: "[w]hat if some evidence in the state's possession that is ordered not to be used is exculpatory[,] and the defense gains no knowledge of it?" The court then concluded that "[o]nly by ex-

cluding all evidence will the Court be assured that another tainted trial will not occur." The court recognized that "this is a severe sanction, but it is warranted by the state's severe misconduct."

The Prosecutor filed a writ of prohibition, asking us to prohibit Judge Prokes from enforcing the exclusion order. We granted a preliminary writ, and the parties filed briefs on the issue.

## Standard of Review

I agree with the majority's recitation of the standard of review, but would add that, although the trial court has broad discretion in administering discovery, including the fashioning of a remedy for a discovery violation, its discretion is not unlimited. *State ex rel. Jackson County Prosecuting Attorney v. Moorhouse*, 70 S.W.3d 552, 555 (Mo.App. W.D.2002); *State v. Simms*, 131 S.W.3d 811, 815 (Mo.App. W.D.2004). Rather, in a criminal case, the trial court must ensure fairness to both the defendant and the State, and, when it does not, we will find an abuse of discretion, and a writ of prohibition will lie. *Moorhouse*, 70 S.W.3d at 555. "An abuse of discretion may arise from a failure to reasonably exercise discretion as well as [from] an affirmative act that goes beyond the proper scope of discretion." *Id.* at 557. However, we begin by presuming that the trial court acted properly, and the party seeking a writ of prohibition bears the burden of rebutting that presumption. *Id.* at 554.

## Law and Analysis

### A. Sanctions for discovery violations in criminal cases

In Missouri, pretrial discovery in criminal cases is governed by Rule 25. Rule 25.18 provides for sanctions for failure to comply with pretrial discovery rules and orders.

> If at any time during the course of the proceeding it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to make disclosure of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances. Willful violation by counsel of an applicable discovery rule or an order issued pursuant thereto may subject counsel to appropriate sanctions by the court.

Rule 25.18.

By its terms, Rule 25.18 draws no distinction between the State and a defendant. Thus, the sanctions described in Rule 25.18 facially apply to discovery violations by both the State and the defendant. *See, e.g., State v. Destefano*, 211 S.W.3d 173, 181 (Mo.App. S.D.2007) (holding that a defense witness was properly excluded as a sanction); *State v. Rippee*, 118 S.W.3d 682, 684 (Mo.App. S.D.2003) (noting that the trial court has the discretion to exclude State's witnesses as a sanction).

If a party violates a discovery rule or a discovery order, "the court may order such party to make disclosure of material and information *not previously disclosed,* grant a continuance, exclude *such* evidence,[18] or enter such other order as it deems just under the circumstances." Rule 25.18. (Emphasis added.) In addition, a willful violation of a rule or order "may subject counsel to appropriate sanctions by the court." *Id.*

Some of the "violations" at issue here possess potentially greater repercussion to

---

18. "Such" clearly refers to "material and information not previously disclosed."

Buchli than others.[19] However, on balance, the State cannot seriously contend that it did not materially (and knowingly) violate the discovery order. Therefore, the focus of this dissent is on the remedy fashioned by the trial court to address the State's violation of the discovery order.[20]

In this case, in remedying the State's failure to timely respond to the discovery order, the trial court considered and rejected the Rule 25.18 options of ordering disclosure of materials and information not previously disclosed, of granting a continuance, and of excluding the "material and information not previously disclosed." Moreover, notwithstanding the Prosecutor's conceded violation of, at a minimum, paragraphs 3, 4, 7, 9, 10, and 17 of the discovery order, the trial court did not impose sanctions on the responsible attorneys. Rather, the trial court exercised its authority under Rule 25.18 to enter "such other order as it deems just under the circumstances," and prohibited the State from introducing any evidence at all. As the trial court acknowledged in its enforcement order, this sanction "effectively renders the state without any evidence with

---

**19.** Some of the violations are merely technical in nature. In the exclusion order, the trial court found that the Prosecutor violated six paragraphs of the discovery order (paragraphs 5, 7, 10, 13, 14, and 15), not by failing to provide the required information, but by failing to provide information in the form required by the discovery order. For example, paragraph 10 required the State to list all records in its possession of criminal charges against Buchli. It is undisputed that the only such charges are the ones that relate to the murder of Armitage. It is hard to imagine a more technical violation than failing to tell the accused in a murder trial that the State, does, in fact, have a record of the current charges.

There appears to have been confusion between the court and the Prosecutor as to the form of the responses that the discovery order required. Unlike the Rules of Civil Procedure, *see* Rules 57.01(c)(2), 58.01(c)(2), & 59.01(d)(2), the Rules of Criminal Procedure provide no specific guideline as to the *form* of the State's production of discovery. The rules merely require the State to produce and disclose certain information, *see* Rule 25.03, without reference to the form that the production is to take. Likewise, in this case, the discovery order mandated that the State "produce" and "disclose" information, but it did not specifically require a formal and itemized "response" to each numbered paragraph, as would be required for a response to a discovery request in the civil context. While the court indicated in the exclusion order that it was his intent in ordering discovery to require formal and detailed disclosures, no such language appeared in the discovery order itself.

The confusion on this point is illustrated by Judge Prokes faulting the Prosecutor for not specifically and formally responding to each paragraph of the discovery order, whereas the Prosecutor apparently believed he was complying by simply producing the required information.

But not all of the State's violations of the discovery order were merely technical. The Prosecutor acknowledged at the show-cause hearing and the trial court found that the State's disclosures in response to the court's discovery order did not include some required information. The prosecution acknowledged that it had not obtained updated addresses on all previously endorsed witnesses (paragraph 3); narrowed its endorsed witness list to those witnesses that it "intend[ed] to call" and updated those witnesses' addresses (paragraph 4); or "run" either group of witnesses through the database to determine if they had prior convictions (paragraphs 9 and 11). Furthermore, the prosecution acknowledged that it had not turned over copies of the twenty-two boxes of financial records that had been acquired from Buchli's law firm (paragraph 2), although defense counsel had been offered access to those materials for their review.

**20.** The majority suggests that this dissenting opinion cites the proper standard for appellate review but then fails to apply that standard. The majority is mistaken. I accept the trial court's findings as to the existence of violations of the discovery order. However, in determining whether Buchli was prejudiced, I cannot ignore the nature of those violations.

which to prove its case at trial," and thus effectively results in a dismissal of the charges against Buchli. *See United States v. Garrett*, 238 F.3d 293, 295 (5th Cir.2000) (recognizing that the exclusion of the government's witnesses was "tantamount to a dismissal"). We must assess, therefore, whether on the record before this court, the sanction of exclusion of all of the State's evidence constituted an abuse of the trial court's discretion.[21]

Rule 25.18 does not articulate the standard to be applied in determining whether a trial court has abused its discretion in sanctioning a discovery violation. However, in determining whether a trial court has abused its discretion, appellate courts in Missouri have consistently considered (1) the prejudice the non-offending party would have suffered as a result of the discovery violation; and (2) the effect on the offending party of the remedy imposed. *State v. Martin*, 103 S.W.3d 255, 260 (Mo.App. W.D.2003); *see also State v. Allen*, 81 S.W.3d 227, 229 (Mo.App. W.D. 2002); and *State v. Hopper*, 315 S.W.3d 361, 368–70 (Mo.App. S.D.2010).[22] In employing this analysis, appellate courts are guided by the over-arching standard that a trial court "is obligated to tailor a fundamentally fair remedy" when discovery rules or orders have been violated. *State v. Cook*, 5 S.W.3d 572, 575 (Mo.App. W.D. 1999). "In fashioning sanctions for a discovery violation, the focus is generally on the removal or amelioration of any prejudice that the [non-offending party] suffers due to the violation." *Martin*, 103 S.W.3d at 260; *see also Allen*, 81 S.W.3d at 232 (Holliger, J., concurring) ("[P]articularly essential" to the trial court's discretion "is an analysis of the potential prejudice to the party who has not received timely disclosure."); *State v. Simonton*, 49 S.W.3d 766, 781 (Mo.App. W.D.2001). Where the prejudice to the non-offending party is nonexistent or negligible, the imposition of drastic sanctions is generally not appropriate. *Martin*, 103 S.W.3d at 260 (citing *Allen*, 81 S.W.3d at 233 (Holliger, J., concurring)); *Hopper*, 315 S.W.3d at 368. In other words, a sanction generally should avoid substantially affecting the offending party's ability to proceed with trial unless the prejudice to the non-offending party cannot otherwise be cured. *See Martin*, 103 S.W.3d at 261.[23]

21. The majority suggests that my approach would render this portion of Rule 25.18 a "nullity through micromanagement"; this is not true. By requiring that there be a record that supports a finding that Buchli was prejudiced by the discovery violations, I seek to ensure that the appellate court can perform its function of determining whether the trial court abused its discretion. The majority's approach, which allows the imposition of severe sanctions for a discovery violation without a record that supports a finding of prejudice to the non-offending party, prohibits any meaningful review by this court and thus sets a dangerous precedent.

22. While many of these cases involve tardy disclosures by a defendant, "[t]he same principles of analysis and discretion apply" whether the defendant or the State committed the discovery violation. *Allen*, 81 S.W.3d at 232 (Holliger, J., concurring).

23. The majority mischaracterizes this approach as a balancing test. It is not that a criminal defendant's interests must be weighed against the State's interests. Rather, it is that the sanction imposed for a discovery violation should be designed to ameliorate the prejudice caused to the non-offending party by the offending party's misconduct. This is not balancing; it is proportionality. Without a record that supports a finding of prejudice, it is impossible for this court to determine whether the trial court abused its discretion in imposing sanctions to ameliorate the supposed prejudice. The need for a record that supports a finding of prejudice is of critical importance when a severe sanction is imposed, and, thus, the offending party's interests are undermined.

Missouri courts have not addressed whether dismissing criminal charges before trial is an appropriate remedy for a discovery violation [24] by the State where the record does not support a finding that the defendant was prejudiced by the nondisclosure. However, federal decisions have held that, in the absence of prejudice to the defendant, trial courts *lack the authority*[25] to dismiss criminal charges as a sanction for discovery violations. *Bank of Nova Scotia v. United States*, 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988) ("We conclude that the District Court had no authority to dismiss the indictment on the basis of prosecutorial misconduct absent a finding that petitioners were prejudiced by such misconduct.");

*United States v. Morrison,* 449 U.S. 361, 365, 101 S.Ct. 665, 66 L.Ed.2d 564 (1981) ("[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the [discovery] violation may have been deliberate."); *United States v. DeCoteau,* 186 F.3d 1008, 1010 (8th Cir.1999) ("Dismissing an indictment is appropriate only if the government's conduct [in violating a discovery order] has substantially prejudiced the defendant."); *United States v. Derrick,* 163 F.3d 799, 808 (4th Cir.1998) ("[V]irtually every other circuit to consider the issue … has also held that an indictment may not be dismissed based on prosecutorial misconduct, absent a showing of prejudice to the defendant.").[26]

**24.** The civil rules, in conspicuous contrast to the criminal rules, explicitly authorize dismissal for discovery violations. *See* Rule 61.01(b)(1), (d)(2), (e), (f), & (g); *see also* Fed. R. Civ. P. 37(b)(2)(A)(v), (b)(2)(B), (c)(1)(C), and (d)(3).

**25.** While I would not go so far as to say that the trial court is completely without authority to dismiss charges as a remedy for discovery violations, the federal approach does highlight the need to conduct the prejudice analysis that I would apply in this case to determine whether there was an abuse of discretion in imposing such a severe sanction.

**26.** In *Bank of Nova Scotia,* the district court found that the prosecutors violated, among other things, the Fifth and Sixth Amendments of the Constitution, knowingly presented misinformation to the grand jury, and mistreated witnesses. 487 U.S. at 253, 108 S.Ct. 2369. The Supreme Court of the United States (with an eight-vote majority that included Justice Brennan) held that, notwithstanding those findings, the indictment could not be dismissed when the record showed no prejudice to the defendant. *Id.* at 254, 108 S.Ct. 2369.

In *Morrison,* the court assumed without deciding that the Government violated the defendant's Sixth Amendment right to counsel by seeking to intimidate her in the absence of her counsel, even though the Government knew that she was represented by counsel.

449 U.S. at 362, 101 S.Ct. 665. The Supreme Court (in a unanimous decision joined by Justice Brennan and Justice Marshall) held that the bad conduct of the Government could not warrant dismissal of the charges in the absence of a showing that the Sixth Amendment violation actually prejudiced, or substantially threatened to prejudice, the defendant. *Id.* at 365, 101 S.Ct. 665.

*DeCoteau* is similar to this case in that it involved the violation of a specific pretrial discovery order regarding disclosure of complete witness information. 186 F.3d at 1009. The Eighth Circuit overruled the district court's dismissal of the charges, holding that such a remedy would be appropriate only in the face of substantial prejudice to the defendant. *Id.* at 1010.

*Derrick* is similar to this case in that one of the defendants had previously been granted a new trial on the basis of the Government's playing a tape before the jury when the tape had previously been ruled inadmissible. 163 F.3d at 803. On remand, the district court found that the government had been wrongfully withholding documents. *Id.* at 803–05. The district court then dismissed the charges, under its supervisory powers, due to the "egregious prosecutorial misconduct" present in that case. *Id.* at 805–06. The Fourth Circuit reversed, holding that the district court's dismissal of the defendants' indictments without any evidence of prejudice was "directly contrary not only to the precedent of

Thus, to determine whether the trial court abused its discretion in imposing the sanction of excluding all of the State's evidence, the record must be reviewed sensitive to the required analysis described *supra.*

### 1. Prejudice to Buchli as a result of the Discovery Violation

The trial court noted in its conclusions of law that:

> Two distinct, but related, issues prompted this Court to exclude all witnesses and exhibits as a sanction for discovery abuse in the instant case. First, the state, throughout the ten year history of this case, has failed to comply with Constitutional and procedural rules regarding discovery, and most recently this Court's June 2, 2010 discovery order. Second, the actions of the state have occasioned a significant waste of judicial resources with no end in sight.

Of these two issues, the second, addressing a waste of judicial resources, has no bearing on whether Buchli was prejudiced as a result of the Prosecutor's discovery violation.[27] The first issue, though not expressed in terms of prejudice to Buchli, could be viewed as a comment on the prejudice to Buchli—a construction supported by the trial court's subsequent reference to the fact that "rules of criminal discovery are not a mere etiquette but the festoons of due process." *State v. Stapleton,* 539 S.W.2d 655, 659 (Mo.App.1976). It is indisputably true that the general purpose of criminal discovery rules requiring the State to disclose a variety of information to a defendant is to permit a defendant a meaningful opportunity to prepare for trial and to avoid surprise. *See State v. Mease,* 842 S.W.2d 98, 108 (Mo. banc 1992); *State v. Wells,* 639 S.W.2d 563, 566 (Mo. banc 1982). There is no authority, however, for presuming prejudice to a defendant in the face of the State's discovery violation, and certainly not prejudice rising to a level that implicates a defendant's due process rights. *See United States v. Presser,* 844 F.2d 1275, 1286 (6th Cir.1988) (holding that the mere threat of a *Brady*[28] violation did not justify sanctioning the government in advance).

The trial court noted certain *hypothetical* prejudice that may have occurred. The trial court's exclusion order noted that the overall delay occasioned to Buchli by virtue of the lengthy and tortured procedural history of his case *could* have had an impact: witnesses may have moved; witnesses may have had arrests, convictions, or disciplinary actions taken against them; evidence may have been lost; or the chain of custody for evidence may have been broken. However, the trial court made the same observation at the time it entered its discovery order, and the observation served to explain why the trial court believed it appropriate to direct the State to produce everything to Buchli—even materials the State had already produced. I do not, therefore, read the trial court's observation as a finding that any of those things

---

this court, but also to clear and well-established Supreme Court precedent." *Id.* at 806.

**27.** The majority suggests that I am arguing that judicial economy can play no role in assessing sanctions for discovery violations. Not so: judicial economy is not an irrelevant or even insubstantial consideration in remedying discovery violations; it is, however, subservient to society's interest in trying a murder case, and it therefore cannot be the basis for remedying a discovery violation when the remedy is the dismissal of criminal charges. It is quite a thing to tell the Armitage family (or, for that matter, the citizens of Missouri) that this murder case cannot be tried because the judiciary was inconvenienced. The law does not require it, and I would not so hold.

**28.** *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

*actually occurred.*[29] The trial court thus did not make any factual findings with respect to the prejudice actually caused Buchli by virtue of the Prosecutor's violation of the discovery order.[30]

Nor does a review of the record reveal any prejudice to Buchli. In Buchli's suggestions in opposition to the writ of prohibition, Buchli does not argue that he was prejudiced by the State's violation of the discovery order. At the show-cause hearing, Buchli generally argued that prejudice occurred due to the large number of documents that his attorneys would have to review in the four months before trial. Buchli argued that he was now going to be required to go through the documents brought by the State to the show-cause hearing or (in the case of the financial documents) promised within a week to determine what was "new" material. It is certainly possible that the late production of documents *could* cause prejudice due to an inadequate time to prepare for trial. However, *this record* does not support a conclusion that the prejudice resulting from the fifty-day delay, between when a response to the discovery order was due and the show-cause hearing, was substantial for two reasons.

First, even had all of the documents discussed at the show-cause hearing been timely produced to Buchli by July 20, 2010, Buchli would have been required to review the documents for new material. Ironically, the need to sort through the produced documents to separate new material from matters already received by Buchli was a direct consequence of the scope of the discovery order—an order sought by

Buchli in the first instance. Thus, Buchli's complaint at the hearing that he would be required to review the documents is not one related to the delay in their production.

Second, though Buchli would have had an additional month and a half to review the documents had the State timely produced them, Buchli volunteered at the show-cause hearing that *he would not have objected to an extension of time* to produce the required documents had an extension been requested by the State. That concession undermines, if not vitiates, the ability to find *on this record* that the time differential between the original production date and the show-cause hearing date caused prejudice to Buchli.

The record does suggest that Buchli and the trial court both expressed frustration that the documents the Prosecutor brought to the show-cause hearing were not segregated in response to each of the paragraphs of the discovery order. However, the discovery order did not require the State to produce the documents in such a fashion. Nor did it require the State to file a responsive pleading with the trial court identifying documents produced in response to each paragraph of the discovery order.[31] All that the State was required to file was a certification of compliance with the discovery order.

The record also reflects that the trial court expressed concern that it had no way of knowing whether the State had produced everything required—and thus whether the State *might* be guilty of a *Brady* violation. Of course, this is a hypothetical concern in any criminal case.

---

**29.** If the court's observation *were* a factual finding, there would be no substantial evidence in the record to support it.

**30.** While the trial court was not required to make a finding of prejudice to impose a sanction under Rule 25.18, had the trial court

made such a finding, it could have been considered by this court in its abuse of discretion analysis.

**31.** *See* discussion in footnote 5.

Though there is no doubt the trial court's concern was appropriately sensitized by the history of discovery abuses and the *Brady* violation in Buchli's original trial, the fact remains that the record made during the show-cause hearing (a hearing expressly intended to address the State's delinquent response to the discovery order) does not in any manner support a conclusion that the State has committed a *Brady* violation. Buchli did argue at the show-cause hearing that "he would bet" that certain documents he expected to find were not included within the documents produced by the Prosecutor. That supposition, however, is not sufficient to permit us to find that any particular or specific document has been withheld from production, or that any such document, if specified, would support a finding of a *Brady* violation. The State's history of honoring its obligations to disclose potentially exculpatory evidence in this case is unacceptable, and sufficient on its face to warrant *suspicion* about the State's current (and future) handling of its discovery and *Brady* obligations. However, there is no authority that permits this court to presume that the State is concealing evidence in a manner that would violate *Brady*, or to presume that prejudice will occur on the mere chance a *Brady* violation *might* occur in the future.

Buchli, the trial court, and the majority all rely heavily on the history of this case, and all have acknowledged or implied that *absent* that history, the State's failure to timely comply with the discovery order would not warrant the exclusion of all evidence. There is no doubt that Buchli's Fourteenth Amendment right to Due Process was violated when the State tried him in 2002 without disclosing certain exculpatory evidence. *Buchli v. State*, 242 S.W.3d 449, 456 (Mo.App. W.D.2007). However, Buchli received a remedy for that violation: a new trial. *Id.* If the Prosecution's pre-remand failure to disclose exculpatory evidence had warranted dismissal of the charges entirely, the motion court would have granted that relief.[32]

It is important to note that Buchli did not allege at the hearing, nor does he argue in his briefing to this court, that the Prosecutor's conduct *post-remand* amounted to an independent violation of Buchli's right to a fair and/or speedy trial. Buchli notes that the rules of discovery are linked to a defendant's due process rights, *Stapleton*, 539 S.W.2d at 659; however, that the rules of discovery facilitate due process does not render every discovery violation a constitutional violation. Further, although both Buchli and the trial court complain about the post-remand assignment of assistant prosecutor Miller to the case and the State's compliance with the rules of discovery at that time, Buchli has not identified how that conduct amounted to a constitutional violation. Thus, neither Buchli nor Judge Prokes has explained how the Prosecutor's *post-remand* conduct has violated Buchli's constitutional rights.

**32.** The majority implies that this dissent ignores the history of this case. Not so: as I have acknowledged, the history of this case naturally (and permissibly) affects the trial court's actions, but that is not to say that any action is permissible or that the past violation of Buchli's rights entitles him to two extreme remedies. That is, given the history of this case, the trial court could conceivably take action that would perhaps not be justified otherwise. But to go to the farthest extreme possible—to dismiss the murder charges without a trial—would almost always require a constitutional violation. That is why I point out that the first constitutional violation has been remedied: not to exclude it from consideration entirely, but to clarify that Buchli does not get to "count" it as a second constitutional violation requiring a second extreme remedy like a new trial, which he has already received, or dismissal of the charges entirely, which he now seeks.

Mere rule violations, resulting in no prejudice or substantial threat thereof, will not justify the dismissal of criminal charges. *See Morrison*, 449 U.S. at 365, 101 S.Ct. 665.[33]

The majority bases its holding on "Buchli's due process right to discovery." But a discovery violation, without more, does not violate the Due Process clause. "[U]nless the [prosecutor's] omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (*overruled on other grounds, as stated in Kowalczyk v. United States*, 936 F.Supp. 1127, 1145–46 (E.D.N.Y.1996)).

Regardless, on the record before us, there is no evidence that, in the post-remand case, the State has violated the Due Process clause, whether via a *Brady* violation or otherwise. In assuming, without a foundation in the record, that a *Brady* violation has occurred, the majority either takes the position that Buchli is entitled to two remedies for the State's *Brady* violation in the pre-remand case or that a second *Brady* violation can be assumed (rather than proved) once one has occurred. "A *Brady* violation includes three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued." *Beuke v. Houk*, 537 F.3d 618, 633 (6th Cir.2008) (internal quotation

marks omitted). None of these elements has been raised, briefed, or argued, much less proved. Moreover, the record before us does not establish that these three elements have been met, and there is no authority for assuming such a violation in the absence of proof of these elements. *See State v. Reed*, 334 S.W.3d 619, 626 (Mo.App. E.D.2011) (holding that the defendant has the burden to *prove* the elements of a *Brady* violation). To assume a *Brady* violation obscures the important question that this case presents, which is whether the discovery violation *on the record before us* justifies dismissal of the charges.

We are presented with a record that permits us to find that Buchli was at best inconvenienced by a delay in the production of the documents ordered to be produced by the discovery order under circumstances where that delay would not have been objectionable to Buchli had the State bothered to ask for an extension of time to respond. This record does not, therefore, support a finding of prejudice or substantial threat thereof to Buchli as a result of the State's violation of the discovery order. For that reason alone, a dismissal of the first-degree murder charges constituted an abuse of discretion.

### 2. Prejudice to the State as a result of the Discovery Sanction Imposed

The second factor we are to consider as we assess whether the trial court's imposed discovery sanction was an abuse of discretion is the extent to which the sanction affects the offending party's ability to proceed to trial—in this case the State. As discussed, the imposed sanction of excluding all of the State's evidence is tanta-

---

**33.** The majority seems to assume that preventing prejudice means something other than ensuring that the defendant receives a fair trial. However, "the notion of fundamental unfairness is to be measured by whether the nondisclosure would have affected the result of the trial," *State v. Farr*, 69 S.W.3d 517, 523 (Mo.App. S.D.2001), not whether the discovery violation caused inconvenience or delay.

mount to a dismissal of the charges against Buchli. There can be no more severe or drastic effect.

The issue is not what effect the sanction will have on the Prosecutor, but rather the effect it will have on the rights and interests of society (the public generally and the victim's family specifically), which has a substantial interest in seeing criminal cases brought to trial so that the truth can be ascertained and justice appropriately administered. *See State v. Carter*, 641 S.W.2d 54, 58 (Mo. banc 1982) ("Not only the defendant, but also the State of Missouri, has a direct interest in an accurate, just and informed verdict based upon all available relevant and material evidence bearing on the question."); *State v. Santonelli*, 600 S.W.2d 205, 206 (Mo.App. E.D. 1980) (holding that courts should be "cognizant of the admonition that an overzealous application of the unsatisfactorily severe remedy of dismissal would infringe the societal interest in trying those accused of crime rather than granting them immunization because of legal error."). There is no state crime more serious than first-degree murder; therefore, in this case, the State of Missouri's interest in having the case tried is at its apex.[34]

Certainly the citizens of this State are equally interested in ensuring that their representatives in prosecuting criminal matters do so within the bounds of the Constitution and applicable court rules; however, in the absence of any evidence *on this record* that would support a finding that the Prosecutor's delinquent response to the discovery order violated Buchli's constitutional right to a fair or speedy trial, I would conclude that the citizens of this State have been substantially prejudiced by the remedy imposed by the trial court for violation of the discovery order. In this case, particularly in light of the fact that this record does not support a finding of prejudice to Buchli associated with the delayed production, I would hold that the trial court's imposed sanction excluding all of the State's evidence "is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Anglim v. Missouri Pacific R.R. Co.*, 832 S.W.2d 298, 303 (Mo. banc 1992); *see Moorhouse*, 70 S.W.3d at 557–58 (holding that the trial court erred in striking the State's witnesses because the defendant's right to discovery was not "prejudicially

---

**34.** The majority suggests that the seriousness of the criminal charges should not be considered in determining whether discovery sanctions were an abuse of discretion because to do so immunizes State misconduct in serious cases. But I do not suggest that if the record in this case supported a finding of prejudice to Buchli, then the seriousness of the charges would warrant imposition of a sanction that did not fully ameliorate the prejudice.

The majority opinion minimizes society's interest in seeing that a murder case is brought to trial. *Cf. Carter*, 641 S.W.2d at 58 (holding that the interest in seeing justice done is shared by the defendant and the citizens of Missouri); *Santonelli*, 600 S.W.2d at 206 (recognizing the "societal interest in trying those accused of crime rather than granting them immunization because of legal er-

ror."). Richard Armitage was murdered. The majority recognizes a societal interest in trying his murder, but, under the majority's view, that interest is so flimsy as to yield to mere discovery violations without a record that supports a finding that these violations prejudiced Buchli's ability to receive a fair trial. I would not hold that society has a weak or nonexistent interest in trying this first-degree murder case. Society's interest in litigating Armitage's death could yield to Buchli's right to a speedy trial or his right to a fair trial. However, it does not yield to Buchli's right to the discovery of evidence (most of which was undisputedly already in his possession) in a neat and tidy form, even when the trial court has, within its discretion, explicitly required that discovery be so produced.

impinged" until the subject discovery was used at trial and holding further that the court was required to use "less drastic measures" than striking the witnesses if such measures "might be sufficient in light of the particular circumstances").

## B. Application of Prejudice Template

Buchli, the trial court, and the majority argue strenuously that the State did not comply with the discovery order. I do not suggest that it did. The record reflects that at the time the trial court dismissed this case, the State had not yet done adequate background checks on potential State witnesses or updated their information, or narrowed the list of possible witnesses to those the State actually intended to call at trial, and certain financial documents had yet to have been formally disclosed (although they had been made available to Buchli's attorneys), but otherwise the prosecution represented that Buchli had everything that it had, and there is nothing in the record that refutes that representation.[35] Yet the trial court did not impose sanctions based on the prosecution's failure to timely produce these categories of evidence. Instead, it dismissed the case. Both the trial court and the majority argue that that extreme (and, at least in Missouri, unprecedented) action was justified because *we can never know* if the State has actually produced everything. The trial court and the majority also appear to assume that records produced at the show-cause hearing may have included some materials not previously disclosed and that this late disclosure might

have prejudiced Buchli. But neither of these assumptions is supported by *this record.*

First, this record does not support the assumption that previously undisclosed material was produced at the show-cause hearing. The prosecution stated early in the show-cause hearing that it had produced everything that it believed was responsive to the discovery order with the exception of certain financial documents that it agreed to produce within a week, an updated witness list, and updated background material on potential witnesses. The Prosecutor stated that most, if not all, of the material was already in Buchli's possession. The Prosecutor also indicated that he could go through the documents produced one by one to assure that Buchli had everything he believed he was entitled to, but because of the volume of materials, the Prosecutor assumed the trial court would not want to do that. After the Prosecutor responded to the court's questions about each paragraph of the discovery order, and the trial court announced that it would grant Buchli's motion, excluding all of the State's evidence, the Prosecutor asked to make a record documenting what discovery he had produced at the hearing. The trial court *refused to allow the State to make a record,* concluding that it was too late for the prosecution to present such evidence—a conclusion that the majority also makes. This decision by the trial court leaves us with a record devoid of evidence as to what new material, if any, was produced at the show-cause hearing.[36]

---

**35.** The majority appears to agree that these are the categories of evidence that were not disclosed at the show-cause hearing. The financial records, updated witness information, and the allegedly equivocal nature of some of the Prosecutor's responses at the show-cause hearing are the deficiencies in the State's response to the discovery order upon which

the majority relies to conclude that the State might never provide full disclosure.

**36.** The majority relies heavily on the notion that, in what amounted to a motion to dismiss the charges, the burden of proof and persuasion lay on the non-moving party. I agree with the principle that, given the State's fail-

Nor does the record support the trial court's and the majority's conclusion that *we can never know* if the State has actually produced everything. Indeed, the linchpin of this conclusion and of the trial court's discovery sanction is the presumption that the Prosecutors may never disclose everything in the State's possession, that some undisclosed material may be exculpatory, and that, therefore, there is a

substantial risk that Buchli will not get a fair trial. But to believe that the State is now concealing evidence is to assert that the current prosecutors, who represent that everything has been produced, are dishonest. Neither the trial court nor the majority go there, and, if they did, there would be no substantial evidence in the record to support them.[37]

ure to comply with the discovery order in a complete and timely fashion and to file a certificate of compliance by the show-cause hearing, it had the burden to show that *some* sanction should not be imposed. But to take the next step, and hold that, in a de facto motion to dismiss, the State has the burden of proof and persuasion, is quite another principle, and one that I cannot accept. The party seeking extraordinary relief bears the burden of showing its entitlement to that relief, *see, e.g., Reed*, 334 S.W.3d at 626 (holding that the burden to prove a *Brady* violation lies on the defendant); and I find it remarkable that that principle is seriously in dispute.

37. A summary of the conduct of these prosecutors after their entry in the case is instructive. When the current prosecutor initially entered the case, he advised the court that, because of his predecessor's conduct *in a different case*, he could not rely on the fact that all documents and evidence had been disclosed *in this case*, but he represented that all documents and evidence would be disclosed. After his review of the evidence, the Prosecutor reported to the court and Buchli's counsel that twenty-two boxes of financial documents seized from Buchli's law office had not been disclosed by his predecessor. The Prosecutor's conduct was appropriate and does not reflect a desire on his part to conceal evidence.

The majority attaches to its opinion "Appendix B," which purports to be a history of discovery violations in this case. The first twelve items address conduct during Buchli's first case and, therefore, do not address any post-remand misconduct. Only two paragraphs of the appendix address alleged discovery violations by the present prosecutors. First, the majority's appendix states that on February 3, 2010, Buchli requested a continuance of the trial date, "based on lack of full disclosure by the state." But a review of the record gives a clearer picture of the basis for

the motion to continue. The record reflects that Buchli moved for a continuance for several reasons unrelated to any discovery violations, including a budget crisis involving the Public Defender system that might affect Buchli's counsel's reimbursement. The record also reflects that Buchli noted that all parties were working to reconstruct a ten-year-old case handled by different attorneys, and that, while the State had provided 1,316 pages of discovery from the police department's file, the last report date was January 15, 2008, and the defense believed that additional tests and reports had been prepared after that time. There is nothing in the record that supports the conclusion that there were police records from after January 15, 2008, that were not disclosed. Therefore, the only other reference in the appendix to misconduct by the current prosecutors that is supported by the record is the failure to timely or completely respond to the discovery order at issue in this case.

The majority also makes much of the fact that the Prosecutor responded to Buchli's motion for a special discovery order by "objecting to almost every one of Buchli's discovery requests." The majority concludes that "[s]howing an incredible amount of restraint, the trial court did not at that time, impose drastic sanctions against the State." But we must remember that what Buchli was asking for was that the State go back and re-produce all discovery in this case. Such a request is extraordinary. And while such a request may have been appropriate under the unique facts of this case, it cannot be said that the Prosecutor engaged in misconduct by objecting to such a request or that the trial court would have been justified in imposing any sanctions, let alone "drastic" sanctions on the State for merely objecting to Buchli's requests.

In short, the record in this case evidences no misconduct by the current Prosecutors in this case other than their delay in providing

Had the trial court imposed sanctions based on the actual discovery violations that occurred and any resulting prejudice to Buchli, I do not believe that a preliminary order in prohibition would have issued, and even if it had, I would be in favor of quashing such a preliminary order. But here, we are faced with the entry of the most extreme discovery sanction possible, based not on the discovery violations that actually occurred, but based on the trial court's conjecture about what discovery violations might have occurred or could occur in the future. Without a more fully developed record, we cannot determine the extent of these discovery violations and, thus, the extent of the prejudice to Buchli that must be ameliorated.[38] Under these circumstances, I believe the only avenue available to this court is to enter a permanent order of prohibition and to remand the case for development of the record or entry of sanction appropriate to any prejudice to Buchli evidenced by the record.[39]

## Conclusion

Our preliminary writ of prohibition should be made absolute. There is no fair trial violation before this court based on *an actual* (as opposed to threatened or conjectural) *Brady* violation. There is only the violation of the court's discovery order.

If an attorney willfully ignores a discovery order, the court may hold that attorney in contempt and may impose other

---

financial records and their delay in responding to the court's June 2, 2010 discovery order. While it would not have been an abuse of discretion to impose sanctions on the State for its violation of the discovery order to the extent that the violation, in combination with any other post-remand violations by assistant prosecutor Miller, prejudiced Buchli, the problem here is that the justification for the extreme sanction imposed was that the current Prosecutors may never disclose everything in the State's possession. There is nothing in the record that supports this speculative conclusion.

**38.** The majority closes its opinion by stating that "[t]he dissent fails to articulate how many violations is enough before the trial court is empowered to enforce the rule of law." But the question for this court is whether this record reflects that the discovery violations prejudiced Buchli so that we can evaluate whether the sanction imposed to ameliorate the prejudice was an abuse of discretion. We do not determine prejudice based on a numeric calculation. A single discovery violation may be sufficient to support extreme sanctions if the record reflects that the non-offending party was substantially prejudiced. But based on this record, we can make no such determination.

**39.** I agree that some sanction would have been proper to remedy the State's failure to comply with the discovery order. The court's

chosen remedy of issuing a dismissal of the charges, however, remains subject to the template for review for abuse of discretion. That template requires us to take into consideration the prejudice occasioned to the non-offending party by the discovery violation and the effect on the offending party of the imposed remedy for that violation. It is perhaps for this reason that Rule 25.18 expressly permits a trial court to address a willful violation of a discovery order by sanctioning the attorneys (and not the party) responsible for the violation.

Indeed, our Supreme Court has recognized that a prosecutor's violation of a discovery rule or order, even a willful violation, should ordinarily be remedied through the court's power to "subject counsel to appropriate sanctions" as opposed to declaring a mistrial or dismissing the charges. *State v. Smothers*, 605 S.W.2d 128, 132–33 (Mo. banc 1980) (holding that the appropriate remedy for "prosecuting attorneys' failure to provide complete discovery" would be to sanction the offending attorneys and that a conviction would not be overturned for such conduct absent a violation of the defendant's right to a fair trial). Declaring a mistrial or dismissing the charges should not be done "until the remedies specified in [present Rule 25.18] are shown to be inadequate." *Id.* at 132.

108

reasonable sanctions. Rule 25.18. Absent a record that the defendant has been prejudiced in that his right to a fair trial has been violated, however, the court may not hold in contempt society's interest by dismissing a first-degree murder case before attempting to force compliance with its orders through less severe sanctions. *Smothers,* 605 S.W.2d at 132 ("Declaration of a mistrial is a remedy reserved for extraordinary circumstances, and *not required in a situation of failure to disclose until the remedies specified in [Rule 25.18] are shown to be inadequate.*") (emphasis added).

Since the record before us does not establish that Buchli was prejudiced by the State's violation of the discovery order, the trial court abused its discretion in dismissing the charges as a remedy for the violation. I respectfully dissent.

CYNTHIA L. MARTIN, Judge, joins in this dissent.